UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NIKKI PARHAM, individually and on behalf of her minor child, B.M., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:18-cv-04678 |
| v. | ) ) | |
| LAKEVIEW LOAN SERVICING, LLC, CENLAR FSB, FIVE BROTHERS MORTGAGE SERVICES COMPANY, and MASTERBUILT CONSTRUCTION INC., | ) ) ) ) ) | District Court Judge Charles R. Norgle, Jr.  Magistrate Judge M. David Weisman |
| Defendants. | ) | |

**FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC.'s ANSWER, AFFIRMATIVE DEFENSES, AND COUNTER-CROSS CLAIM TO DEFENDANT CENLAR FSB'S CROSS-CLAIM**

NOW COMES the Defendant, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC., improperly named as FIVE BROTHERS MORTGAGE SERVICES COMPANY ("Five Brothers"), by and through one of its attorneys, BRIAN J. ARMSTRONG of LUETKEHANS, BRADY, GARNER & ARMSTRONG, LLC, and for its Answer, Affirmative Defenses and Counter-Cross Claim to Defendant, CENLAR FSB's, Cross Claim, states as follows:

### PARTIES

1.    Cenlar is engaged in the business of servicing mortgage loans.

**ANSWER:**    Five Brothers admits the allegations of Paragraph 1.

2.    Five Brothers is engaged in the business of providing real property preservation services to, among others, lenders and mortgage loan servicers.

**ANSWER:**    Five Brothers admits the allegations of Paragraph 2, and further states that all such work is and was provided by Five Brothers' independent contractor(s).

1

3.     Masterbuilt Construction, Inc. ("Masterbuilt") is a residential construction contractor. Upon information and belief, Five Brothers subcontracted some of its property preservation work to Masterbuilt.

**ANSWER:**     Five Brothers has knowledge and information insufficient to form a belief as to the truth or falsity of the allegation that Masterbuilt is a residential construction contractor and, therefore, neither admits nor denies same, but demands strict proof thereof.   Further answering, Five Brothers admits it does subcontract with Masterbuilt for property preservation services.

4.     Plaintiff Nikki Parham is the owner of real property commonly known as 7523 South Ridgeland Avenue, Chicago, IL (the "Property"). Plaintiff "BM" is Nikki Parham's son. Nikki Parham and her son "BM" resided at the Property at the time of the events at issue.

**ANSWER:**     Five Brothers has knowledge and information insufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 and, therefore, neither admits nor denies same, but demands strict proof thereof.

## ALLEGATIONS COMMON TO ALL COUNTS

5.     Cenlar previously serviced the mortgage loan taken by Nikki Parham on the Property.

**ANSWER:**     Five Brothers admits the allegations of Paragraph 5.

6.     As a result of Nikki Parham's failure to make monthly mortgage payments, a foreclosure action was filed, and a judgment of foreclosure and sale was entered. The judicial sale was set for July 28, 2017.

**ANSWER:**     Five Brothers admits that a judicial sale was scheduled for July 28, 2017.  Further answering, Five Brothers has knowledge and information insufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 6 and, therefore, neither admits nor denies same, but demands strict proof thereof.

7.     After the loan default, Cenlar engaged Five Brothers to do an occupancy check of the Property, and if there was sufficient evidence of vacancy and if vacancy could be confirmed by one of the neighbors, to secure the Property in order to protect the collateral.

**ANSWER:**     Five Brothers admits that Cenlar issued Five Brothers a Work Order to provide property inspection and preservation services at the Property utilizing Five Brothers' independent contractors.

8.     Five Brothers subcontracted this work to Masterbuilt.

**ANSWER:**     Five Brothers admits that it subcontracted with Masterbuilt for Masterbuilt to provide certain work at the Property.

9.     On July 7, 2017, Masterbuilt appeared at the Property for the occupancy check. Upon information and belief, none of the neighbors confirmed for Five Brothers or Masterbuilt that the property was vacant.

**ANSWER:**     Five Brothers admits that on or about July 7, 2017, Masterbuilt appeared at the Property. Further answering, Five Brothers has knowledge and information insufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 9 and, therefore, neither admits nor denies same, but demands strict proof thereof.

10.     Plaintiffs allege that Masterbuilt kicked in the rear door of the Property and installed a latch and padlock, entered the Property, and walked around the Property searching for evidence of occupancy or vacancy.

**ANSWER:**     Five Brothers admits that the allegations of Paragraph 10 summarize certain of Plaintiff Nikki Parham's allegations in her Amended Complaint, however, Five Brothers was not at the property and denies the allegations to the extent they pertain to Five Brothers.

11.     Plaintiffs commenced this Action initially against Cenlar and Lakeview only, and later filing an amended complaint by which they also joined as defendants, Five Brothers and Masterbuilt.

**ANSWER:**     Five Brothers admits the allegations of Paragraph 11. Further answering, upon info and belief, Five Brothers was added by Plaintiffs at the request of Cenlar.

## COUNT I
## EXPRESS INDEMNIFICATION AGAINST FIVE BROTHERS

12.     Cenlar reallege paragraphs 1 through 11 above as this paragraph 12 as though fully set forth herein.

**ANSWER:**     Five Brothers realleges and incorporates by reference its responses in Paragraphs 1 through 11 as Paragraphs 1 through 11 of this Count I.

13.     Five Brothers and Cenlar entered into a Field Services Agreement effective April 1, 2014 (the "5B Agreement"). A true and correct copy of the 5B Agreement is attached as Exhibit 1.

**ANSWER:**     Five Brothers admits the allegations of Paragraph 13.

14.     The term of the 5B Agreement were [sic] extended from time-to-time, and the 5B Agreement was in force on July 7, 2017. True and correct copies of the third amendment to the 5B Agreement is attached as Exhibit 2.

**ANSWER:**     Five Brothers admits the allegations of Paragraph 14.

15.     Cenlar performed its obligations under the terms of the 5B Agreement.

**ANSWER:**     Five Brothers makes no answer to the allegations contained in Paragraph 15 because Paragraph 15 alleges no facts but states a conclusion of law. To the extent Paragraph 15 is construed as alleging facts against Five Brothers, they are denied.

16.     The 5B Agreement incorporates a Statement of Work attached as Exhibit A to the 5B Contract ("Statement of Work"). Five Brothers agreed, in the Statement of Work, that "[o]nce an initial securing order has been issued by [Cenlar], Five Brothers will confirm vacancy, inspect the property and complete the following upon [Cenlar's instruction]…"

**ANSWER:**     Five Brothers makes no response to the allegations contained in Paragraph 16 because the documentation attached to Cenlar's cross claim speaks for itself. Further answering, Five Brothers denies that Cenlar has quoted the entire relevant portions of the Statement of Work and denies Cenlar's characterization of the Statement of Work. Five Brothers Denies and will continue to deny that it is liable to Cross-Plaintiff.

4

17.    Pursuant to section 4 of the 5B Contract, Five Brothers agreed to indemnify and hold harmless Cenlar, "against any and all loss, claims, injury, liability, damages, penalties, fines, forfeitures, attorney fees and costs, of any kind whatsoever (each a "Loss" and collectively, "Losses"), arising from or in any way connected with Five Brothers' (a) violation of any law or regulation; (b) non-compliance with the terms set forth herein or the breach of any warranty or representation set forth herein; (c) any claims or actions whatsoever brought by any subcontractor or on behalf of a subcontractor hired by Five Brothers; (d) negligent wrongful acts or misconduct by Five Brothers, its employees, officers, directors, agents, contractors or subcontractors; (e) any claims or actions brought by a third party alleging damage or injury to the property or person arising out of an act or omission by Five Brothers, or (f) any mistakes by Five Brothers relating to performance of the services herein." Section 4 further provides that this indemnity "shall extend to any and all alleged acts or omissions (whether willful, intentional, negligent, or grossly negligent) committed by Five Brothers, its agents, employees, subcontractors, or independent contractors, while performing services for Customer." 5B Contract, § 4, Exhibit 1.

**ANSWER:**    Five Brothers makes no response to the allegations contained in Paragraph 17 because the documentation attached to Cenlar's cross claim speaks for itself. Further answering, Five Brothers states the 5B Contract speaks for itself, and denies that Cenlar has quoted the entire relevant portion of the 5B Contract and denies Cenlar's characterization of the Contract. Five Brothers Denies and will continue to deny that it is liable to Cross-Plaintiff.

18.    Masterbuilt acted as Five Brother's subcontractor in connection with the services Masterbuilt performed at the Property on July 7, 2017.

**ANSWER:**    Five Brothers makes no response to the allegations contained in Paragraph 18 because Paragraph 18 states a legal conclusion to which no response is required. Five Brothers denies and will continue to deny it is liable to Cross-Plaintiff.

5

19.    Cenlar has sustained a Loss within the meaning of section 4 of the 5B Contract based on the attorney's fees and costs it has incurred to defend the claims filed by Plaintiffs in this Action.

**ANSWER:**    Five Brothers denies the allegations of Paragraph 19.

20.    Plaintiffs' claims arise out of and/or connected to the violation of law, non-compliance with the 5B Agreement, negligent wrongful acts or misconduct of Five Brothers and/or Masterbuilt, third-party claims alleging damage or injury to the Property or to the person of the Plaintiff arising out of an act or omission by Five Brothers, mistakes by Five Brothers relating to performance of the services, and/or acts or omissions, whether willful, intentional, negligent, or grossly negligent, committed by Five Brothers and/or Masterbuilt.

**ANSWER:**    Five Brothers makes no answer to the allegations contained in Paragraph 20 because Paragraph 20 alleges no facts but states a conclusion of law. To the extent Paragraph 20 is construed as alleging facts against Five Brothers, they are denied.

21.    Five Brothers is contractually obligated to indemnify Cenlar for the attorney's fees and costs incurred by Cenlar to defend this Action, and any settlement or judgment in favor or either Plaintiff.

**ANSWER:**    Five Brothers makes no answer to the allegations contained in Paragraph 21 because Paragraph 21 alleges no facts but states a conclusion of law. To the extent Paragraph 21 is construed as alleging facts against Five Brothers, they are denied.

WHEREFORE, Defendant, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC. improperly named as FIVE BROTHERS MORTGAGE SERVICES COMPANY, denies that Defendant, CENLAR FSB is entitled to any judgment in its favor and prays this Honorable Court enter judgment in its favor and against Defendant, CENLAR FSB, and allows for costs of defending this lawsuit.

## JURY DEMAND

Cross Defendant demands trial by jury.

/s/ Brian J. Armstrong
One of Defendant's, FIVE BROTHERS
MORTGAGE COMPANY SERVICES
AND SECURING, INC., Attorneys

## AFFIRMATIVE DEFENSES

NOW COMES the Defendant, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC., improperly named as FIVE BROTHERS MORTGAGE SERVICES COMPANY ("Five Brothers"), by and through one of its attorneys, BRIAN J. ARMSTRONG of LUETKEHANS, BRADY, GARNER & ARMSTRONG, LLC, and for its Affirmative Defenses to Defendant/Cross Claimant, CENLAR FSB's, Cross Claim, states as follows:

## FIRST AFFIRMATIVE DEFENSE

1.      The Construction Contract Indemnification for Negligence Act states (the "Act"):

> With respect to contracts or agreements, either public or private, for the construction, alteration, repair or maintenance of a building, structure, highway bridge, viaducts or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable. 740 ILCS 35/1.

2.      The Agreement between Cenlar and Five Brothers constitutes an "agreement for the construction, alteration, repair or maintenance of a building, [or] structure" under the Act.

3.      Plaintiffs' Amended Complaint alleges claims against Cenlar and Five Brothers arising out of alteration, repair or maintenance of a building or structure.

4.      Plaintiffs' Amended Complaint alleges, *inter alia*, that Cenlar's acts or omissions caused Plaintiffs damages.

5. To the extent Cenlar seeks indemnification pursuant to the indemnification provision of the Agreement for its own conduct which caused Plaintiffs' damages, the indemnification provision is void and unenforceable pursuant to the Act.

## SECOND AFFIRMATIVE DEFENSE

1. To the extent New Jersey law applies, New Jersey Stat. Ann. § 2A:40A-1 (the "New Jersey Act") states:

> A covenant, promise, agreement or understanding in, or in connection with or collateral to a contract, agreement or purchase order, relative to the construction, alteration, repair, maintenance, servicing, or security of a building, structure, highway, railroad, appurtenance and appliance, including moving, demolition, excavating, grading, clearing, site preparation or development of real property connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents, or employees, is against public policy and is void and unenforceable; provided that this section shall not affect the validity of any insurance contract, workmen's compensation or agreement issued by an authorized insurer. N.J. Stat. Ann. § 2A:40A-1 (West)

2. The Agreement between Cenlar and Five Brothers constitutes an "agreement for the construction, alteration, repair or maintenance of a building, [or] structure" under the New Jersey Act.

3. Plaintiffs' Amended Complaint alleges claims against Cenlar and Five Brothers arising out of alteration, repair or maintenance of a building or structure.

4. Plaintiffs' Amended Complaint alleges, *inter alia*, that Cenlar's acts or omissions caused Plaintiffs' damages.

5. To the extent Cenlar seeks indemnification pursuant to the indemnification provision of the Agreement for its own conduct which caused Plaintiffs damages, the indemnification provision is void and unenforceable pursuant to the New Jersey Act.

8

## THIRD AFFIRMATIVE DEFENSE

1.      An indemnification agreement which purports to indemnify one for willful or intentional conduct is void.

2.      Plaintiffs' Amended Complaint alleges, *inter alia*, that Cenlar's willful and/or intentional acts or omissions caused Plaintiffs' damages.

3.      Cenlar's Cross Claim seeks indemnification for its alleged willful and/or intentional conduct which caused Plaintiffs damages.

4.      To the extent Cenlar seeks indemnification pursuant to the indemnification provision of the Agreement for its willful and/or intentional conduct which caused Plaintiffs damages, the indemnification provision is void and unenforceable.

## FOURTH AFFIRMATIVE DEFENSE

1.      An indemnification agreement may not indemnify one for its own conduct unless the indemnification agreement contains clear and explicit language of such intention.

2.      An indemnification provision which does not contain clear and explicit language expressing the intention to indemnify an indemnitee for its own conduct is really a contribution provisions rather than indemnification provision.

3.      Accordingly, a purported indemnification provision which does not contain clear and explicit language expressing the intention to indemnify an indemnitee for its own may require contribution only, not indemnification.

4.      The Agreement's indemnification provision relied on by Cenlar does not contain clear and explicit language expressing the intention that Five Brothers would indemnify Cenlar for Cenlar's conduct.

5. Accordingly, the Agreement's indemnification provision relied on by Cenlar is a contribution provision, not an indemnification provision, and does not and cannot compel Five Brothers to indemnify Cenlar.

WHEREFORE, Defendant, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC. improperly named as FIVE BROTHERS MORTGAGE SERVICES COMPANY, denies that Defendant, CENLAR FSB is entitled to any judgment in its favor and prays this Honorable Court enter judgment in its favor and against Defendant, CENLAR FSB, and allows for costs of defending this lawsuit.

> _____/s/ Brian J. Armstrong_____
> One of Counter Cross-Plaintiff's, FIVE BROTHERS
> MORTGAGE COMPANY SERVICES AND
> SECURING, INC., Attorneys

## COUNTER CROSSCLAIM AGAINST CENLAR FSB

NOW COMES Defendant/Cross-Defendant/Counter Cross-Plaintiff, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC. ("Five Brothers"), by and through one of its attorneys, BRIAN J. ARMSTRONG of LUETKEHANS, BRADY, GARNER & ARMSTRONG, LLC, and for its Counter Crossclaim against CENLAR FSB ("Cenlar"), states as follows:

## FACTS COMMON TO ALL CLAIMS

1. Plaintiffs, Nikki Parham and BM, have filed an Amended Complaint at Law against Defendants, Cenlar, Masterbuilt, and Five Brothers, attached hereto as Exhibit 1. Defendant, Five Brothers, has filed an Answer and Affirmative Defenses denying that they are liable to Plaintiffs and raise this Cross-Claim in the alternative to their denials of liability.

2.      In her Amended Complaint, Plaintiff alleges that Five Brothers is engaged in the business of providing real property preservation field services to banks, mortgage companies, investors, and mortgage loan servicers.

3.      In her Amended Complaint, Plaintiff alleges that Cenlar is in the business of servicing residential mortgage loans.

4.      In her Amended Complaint, Plaintiff alleges that Cenlar previously serviced the mortgage loan taken by Plaintiff, NIKKI PARHAM ("Plaintiff"), on the property commonly known as 7523 South Ridgeland Avenue, Chicago, Illinois (the "Property").

5.      In her Amended Complaint, Plaintiff alleges that in 2016, her lender filed a foreclosure complaint in the Circuit Court of Cook County seeking to foreclose on the Property.

6.      In her Amended Complaint, Plaintiff alleges that On or about November 30, 2016, Plaintiff filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois.

7.      In her Amended Complaint, Plaintiff alleges that on or about April 3, 2017, the Bankruptcy Court confirmed the Chapter 13 Bankruptcy Plan (the "Plan").

8.      In her Amended Complaint, Plaintiff alleges that Cenlar was bound to the terms of the Plan.

9.      In her Amended Complaint, Plaintiff alleges that notwithstanding the Plan, Plaintiff was unable to make her payment obligations under the Plan.

10.      In her Amended Complaint, Plaintiff alleges that on or about June 5, 2017, Plaintiff's lender obtained authorization from the Bankruptcy Court to proceed with the previously-filed foreclosure proceeding regarding the Property.

11.     In her Amended Complaint, Plaintiff alleges that pursuant to the foreclosure proceeding, a foreclosure sale of the Property was scheduled for July 28, 2017.

12.     In her Amended Complaint, Plaintiff alleges that on or about June 19, 2017, Plaintiff submitted to Cenlar a complete loan modification application to modify the mortgage on the Property (the "Application").

13.     In her Amended Complaint, Plaintiff alleges that on or about July 7, 2017, Cenlar issued a work order to Five Brothers to perform property preservation services at the Property (the "Work Order").

14.     In her Amended Complaint, Plaintiff alleges that the acts or omissions of Fiber Brothers, Cenlar and others caused Plaintiffs' damages.

## COUNT I - INDEMNIFICATION

15.     In 2014, Cenlar entered into a Field Services Agreement with Five Brothers for Five Brothers to provide property preservation and other services to Cenlar (the "Agreement").   A copy of the Agreement is attached hereto as Exhibit 2.

16.     The Agreement was periodically extended, with the last extension having occurred in March 2017.  A copy of the March 2017 extension is attached hereto as Exhibit 3.

17.     When it issued the Work Order, Cenlar had an obligation to notify Five Brothers that Plaintiff had filed the Application.

18.     Cenlar failed to notify or provide any information to Five Brothers that Plaintiff had filed the Application before Cenlar issued the Work Order.

19.     Paragraph 4 of the Agreement states:

> The Customer shall likewise indemnify and hold harmless Five Brothers, its affiliates, subsidiaries, respective employees, officers, directors, owners, agents and representatives against all damages, costs, claims, judgments, liability and expenses of any kind

whatsoever (including reasonable attorneys' fees) sustained by Five Brothers in connection with any third party claim, suit or proceeding based on or arising out of any mistake, misinformation, wrongful act or omission of Customer, its contractors, agents, employees, officers, directors, owners and representatives in performance of its obligations under this Agreement. The Customer shall assume full responsibility for payment of the cost, defense and settlement of such claim, action or proceeding.

20.     Cenlar's failure to notify Five Brothers that Plaintiff had filed the Application before Cenlar issued the Work Order is a mistake, misinformation, wrongful act and/or omission which is the basis for, and gives rise to, Plaintiffs' claims.

21.     Cenlar's failure to provide Five Brothers accurate information when and after it issued the Work Order that Plaintiff had filed the Application, is a breach of the Agreement.

22.     Five Brothers performed its obligations under the Agreement.

23.     Cenlar has failed to comply with its obligations under the Agreement.

24.     Five Brothers has sustained a loss within the meaning of Section 4 of the Agreement based on attorneys' and costs it has incurred to defend the claims filed by Plaintiffs.

25.     Additionally, Five Brothers may sustain additional loss under the meaning of Section 4 if a verdict is entered in favor of Plaintiffs against Five Brothers, or if Five Brothers pays any settlement money to Plaintiffs.

26.     Plaintiff Parham and B.M.'s claims against Five Brothers are based on, or arise out of, a mistake, misinformation, wrongful act, and/or omission of Cenlar.

27.     Cenlar is obligated to indemnify Five Brothers for the attorneys' fees and costs incurred by Five Brothers to defend this action and any settlement or judgment against Five Brothers in favor of either Plaintiff.

WHEREFORE, Defendant/Cross-Defendant/Counter Cross-Plaintiff, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC., requests that judgment be

entered in its favor and against CENLAR FSB in an amount equal to the sum of fees and costs incurred by FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC. to defend this action, plus any judgment or settlement in favor of either Plaintiff and for such other relief this Court deems equitable and just.

## COUNT II – CONTRIBUTION

28.     Five Brothers repeats and realleges paragraphs 1 through 27 of Count I, as and for paragraph 28 of this Count II.

29.     In her Amended Complaint, Plaintiff alleges that Cenlar's actions and/or omissions proximately caused damages to Plaintiffs and the Property.

30.     Cenlar had a duty to notify Five Brothers that Plaintiff had submitted the Application to Cenlar prior to the Work Order.

31.     Cenlar breached its duty to Five Brothers by failing to notify Five Brothers that Plaintiff had recently filed the Application prior to the Work Order.

32.     It was reasonably foreseeable to Cenlar that failing to notify Five Brothers at the time it issued the Work Order that Plaintiff had previously filed the Application could result in damage to Plaintiffs, the Property and Plaintiff's personal property.

33.     The Illinois Contribution Among Joint Tortfeasors Act, 740 ILCS 100/0.01 *et seq*. (the "Act"), permits a defendant who pays more than its pro rata share of liability to plaintiff to recover from a co-defendant any amount over and above the pro rata share.

34.     If Plaintiffs recover a judgment against Five Brothers for the damages alleged in the Amended Complaint, all of which is denied by Five Brothers, any such liability therefore imposed on Five Brothers will have been caused and brought about by reason of the negligence, carelessness, recklessness, breach of contract, trespass, violation of statute and/or other acts of

omission or commission and/or intentional tortious conduct of the Defendant CENLAR, FSB, and/or their agents, servants and/or employees.

35.    By virtue of the Act, if Five Brothers is found liable to Plaintiff, which liability Five Brothers denies, Five Brothers will be entitled to judgment against Cenlar by way of contribution for any amount of judgment entered against Five Brothers in excess of Five Brothers' pro rata share of liability, and in an amount commensurate with the relative culpability of Cenlar in causing or contributing to Plaintiffs' injuries.

WHEREFORE, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC., prays that in the event a judgment is entered against it in this action, that it will be granted judgment for contribution in its favor and against Counter Cross-Defendant, CENLAR FSB, in an amount commensurate with the relative degree of fault of the parties, together with FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC.'s costs and attorney fees in this action.

_____/s/ Brian J. Armstrong_____
One of Counter Cross-Plaintiff's, FIVE BROTHERS
MORTGAGE COMPANY SERVICES AND
SECURING, INC., Attorneys

Phillip A. Luetkehans #06198315
pal@lbgalaw.com
Brian J. Armstrong #06236639
bja@lbgalaw.com
Jessica G. Nosalski #6336460
jgn@lbgalaw.com
Luetkehans, Brady, Garner & Armstrong, LLC
105 East Irving Park Road
Itasca, IL 60143
(630) 773-8500

## CERTIFICATE OF FILING
## & SERVICE

I, BRIAN J. ARMSTRONG, hereby certify that on the 21st day of February, 2022, I electronically filed the foregoing Five Brothers Mortgage Company Services and Securing, Inc.'s Answer, Affirmative Defenses, and Counter-Cross Claim to Defendant Cenlar FSB's Cross-Claim with the United States District Court for the Northern District of Illinois Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael P. Adams
Hinshaw & Culbertson LLP
151 N. Franklin Street, Ste. 2500
Chicago, IL 60606
madams@hinshawlaw.com

Mohammed O. Badwan
Sulaiman Law Group, Ltd.
2500 S. Highland Ave., Ste. 200
Lombard, IL 60148
mbadwan@sulaimanlaw.com

Ryan G. Rudich
Fielden A. Fleming
Freeborn & Peters
311 S. Wacker Dr., Ste. 3000
Chicago, IL 60606
rrudich@freeborn.com
ffleming@freeborn.com

Fritz V. Wilson
Lori A. Vanderlaan
Best, Vanderlaan & Harrington
25 E. Washington St., #800
Chicago, IL 60602
fwilson@bestfirm.com
lvanderlaan@bestfirm.com
eservice@bestfirm.com

and I certify that on the 21st day of February, 2022, I have mailed by United States Postal Service

said document to the following non-CM/ECF participants:

None.

_____/s/ Brian J. Armstrong_____
BRIAN J. ARMSTRONG

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| NIKKI PARHAM, individually and on behalf of her minor child, B.M., | |
| Plaintiffs, | Case No.1:18-cv-04678 |
| v. | Honorable Charles R. Norgle, Sr. |
| LAKEVIEW LOAN SERVICING, LLC, CENLAR FSB, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC., and MASTERBUILT CONSTRUCTION, INC. | Magistrate Judge M. David Weisman |
| Defendants. | |

### FIRST AMENDED COMPLAINT

**NOW COME** Plaintiffs, NIKKI PARHAM, individually and on behalf of her minor child, B.M. (individually, "Nikki" and "B.M.," collectively "Plaintiffs") by and through their undersigned counsel, complaining of the Defendants, LAKEVIEW LOAN SERVICING, LLC, CENLAR FSB, FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC., and MASTERBUILT CONTSTRUCTION, INC. (collectively, "Defendants"), as follows:

### NATURE OF THE ACTION

1. Plaintiffs bring this action seeking redress for breach of contract, trespass to real property, violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") pursuant to 815 ILCS 505/1 et seq., violations of the Fair Debt Collection Practices Act ("FDCPA") pursuant to 15 U.S.C. §1692, intrusion upon seclusion, intentional infliction of emotional distress, conversion, and negligence.

1

**Exhibit 1**

2.   All of Plaintiffs' claims stem from Defendants' illegal debt collection activity relating to Nikki's home mortgage loan. Defendants illegally broke into Nikki's home without authorization and damaged Nikki's home.

## JURISDICTION AND VENUE

3.   Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States.

4.   The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

5.   Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiffs reside in this judicial district, Defendants conduct business in this judicial district, and all of the events or omissions giving rise to the claims occurred within this district.

## PARTIES

6.   Plaintiffs are natural persons that reside at a property commonly known as 7523 South Ridgeland Avenue, Chicago, IL ("subject property").

7.   Nikki is a single mother of two children, whom at all times relevant was employed at Chicago Commons, a not-for-profit social organization that serves under-resourced communities throughout the city of Chicago.

8.   B.M. is Nikki's 15 year old son that suffers from a neurological disorder known as epilepsy.

9.   The subject property serves as Nikki's family's principal residence.

10.  Lakeview Loan Servicing, LLC ("Lakeview") is a mortgage company based out of Coral Gables, Florida. Lakeview is in the business of extending mortgage loans to consumers across the United States, including consumers in Illinois. Lakeview is also in the business of acquiring and servicing mortgage loans that were originated by a third party. Lakeview acquires mortgage loans

2

and services mortgage loans owed by Illinois consumers. Lakeview does business in Illinois. Lakeview is registered with the Illinois Secretary of State.

11. Cenlar FSB ("Cenlar") is a mortgage loan subservicing company with headquarters located in Ewing, New Jersey. Cenlar services and subservices mortgage loans for third party loan owners. Cenlar services and subservices mortgage loans owed by Illinois consumers. Cenlar does business in Illinois. Cenlar is registered with the Illinois Secretary of State.

12. Five Brothers Mortgage Company Services and Securing, Inc. ("Five Brothers") is an asset preservation company with headquarters located in Warren, Michigan. Five Brothers provides property preservation services to mortgage loan servicers. According to its website, "Five Brothers consistently provides innovative, regulatory-compliant asset management solutions that save time, eliminate errors and increase efficiency for residential mortgage servicers nationwide."[1] Five Brothers provides services to mortgage loan servicers that service mortgage loans extended to Illinois consumers and thus does business in Illinois. Five Brothers is registered with the Illinois Secretary of State.

13. Masterbuilt Construction, Inc.("Masterbuilt") is an asset preservation company based out of Lombard, Illinois. Masterbuilt provides property preservation services to mortgage loan servicers. Masterbuilt provides property preservation services to mortgage loan servicers that service mortgage loans extended to Illinois consumers. Masterbuilt is registered with the Illinois Secretary of State.

---

[1] www.fivebrms.com (last visited March 5, 2020)

3

## FACTS SUPPORTING CAUSES OF ACTION

14. On May 29, 2014, Nikki obtained a mortgage loan ("subject loan") in the amount of $157,003.00 from Sun West Mortgage Company, Inc. ("Sun West"), secured by the subject property.

15. B.M. was not a party to the subject loan.

16. Pursuant to the terms of the loan, Nikki was obligated to make monthly principal and interest payments in the initial amount of $772.36 for 30 years.

17. Due to a decrease in monthly income, Nikki defaulted on the subject loan.

18. In late 2015, after the subject loan was in default, Lakeview acquired the subject loan from Sun West.

19. As soon as Lakeview acquired the subject loan, it assigned servicing rights for the subject loan to Cenlar.

20. Accordingly, Cenlar became the face of the subject loan and was responsible for the day-to-day management and administration of the subject loan.

21. In December 2016, Nikki submitted a complete loan modification application to Cenlar. The loan modification, if granted, would modify the repayment terms of the subject loan and deem Nikki current on the subject loan.[2]

22. Despite submitting a complete loan modification application, Cenlar never responded to Nikki's loan modification application.

---

[2] Loan modifications are designed to prevent homeowners from losing their homes by deferring the default amount to the end of the loan. Loan modifications typically change the terms of the loan by extending the repayment period without reducing the principal and interest balance owed on a loan.

4

23.   On January 13, 2016, Lakeview filed a foreclosure complaint in the Circuit Court of Cook County seeking to foreclose on the subject property, Case No. 2016-CH-00476 ("foreclosure proceeding").

24.   On November 30, 2016, in an effort to save her family's home, Nikki filed a Chapter 13 bankruptcy in the Bankruptcy Court for the Northern District of Illinois, Case No. 16-37792.

25.   By operation of law, Nikki's bankruptcy filing stayed the foreclosure proceeding. *See* 11 U.S.C. §362.

26.   In February 2017, B.M. underwent brain surgery to treat the subclinical seizures that stem from his epilepsy disorder.

27.   On March 9, 2017, Nikki filed a Chapter 13 Plan which proposed a repayment plan that would, in pertinent part, (1) recommence contractual monthly payments on the subject loan; and (2) cure the default on the subject loan over 60 months.

28.   On April 3, 2017, the Bankruptcy Court confirmed Nikki's Chapter 13 Plan ("Confirmed Plan"), thus binding Lakeview and Cenlar to the terms of the Confirmed Plan.

29.   Due to Nikki's dire financial circumstances, Nikki fell behind on her monthly payments as prescribed by the Confirmed Plan.

30.   As a result, on June 5, 2017, Lakeview obtained authorization from the Bankruptcy Court to continue the foreclosure proceeding.

31.   The foreclosure proceeding progressed and a sale of the subject property was scheduled for July 28, 2017.

32.   Prior to the sale date, Cenlar sent Nikki a loan modification application.

33.   On June 19, 2017, in an effort to save her family's home, Nikki submitted a complete loan modification application to Cenlar.

5

34. Upon information and belief, in late 2017, Cenlar employed Five Brothers to facilitate the collection of the subject loan and to perform property preservation services at the subject property, which in turn employed Masterbuilt to do the same.

35. On or about July 7, 2017, Cenlar issued a detailed work order to its agents Five Brothers and/or Masterbuilt ("Cenlar's agents") to perform specific property preservation services at the subject property in an effort to facilitate collection on the subject loan.

36. Shortly thereafter, Cenlar's agents went to the subject property to carry out Cenlar's work order.

37. At the time Cenlar's agents arrived at the subject property, Nikki was at work and B.M. was home alone.

38. Upon arrival to the doorstep to the subject property, Cenlar's agents began banging loudly on the front door.

39. In response to the banging, B.M., not expecting any visitors, went to a nearby window and observed an individual banging on the front door and multiple individuals congregating by the front door and lawn.

40. B.M., fearing for his safety, did not answer the door or otherwise try to communicate with Cenlar's agents as he did not recognize them and did not know why they were at his home.

41. Shortly thereafter, the banging stopped and B.M. thought that Cenlar's agents left the subject property.

42. A couple of minutes later, B.M. heard loud bangs coming from the back door of the subject property.

43. B.M., fearing for his safety, did not open the back door and believed that Cenlars' agents would leave if nobody answered the back door.

6

44. Shortly thereafter, B.M. started hearing loud booms coming from the back door.

45. At this point, B.M. believed that Cenlar's agents were trying to break down the back door.

46. Fearing for his safety, B.M. ran to the basement of the subject property and hid in the furnace closet.

47. Shortly thereafter, B.M. heard a loud crash, followed by the sound of footsteps on the main level of the subject property.

48. In a state of panic and fright, B.M. went to a computer near the furnace closet and sent an email to Nikki stating that someone broke into the house and urged Nikki to come home.

49. At that point, B.M. started hearing the voices of Cenlar's agents as they walked around the house.

50. At no point after entry into the subject property did Cenlar's agents identify themselves.

51. Shortly thereafter, Cenlar's agents went to the basement where B.M. was hiding in the furnace closet and began shining flashlights throughout the basement.

52. At that point, B.M. believed that Cenlar's agents were looking for him and were going to kill him.

53. Cenlar's agents then approached the furnace closet where B.M. was hiding.

54. In a state of terror, B.M. hid as far back behind the furnace as possible.

55. Cenlar's agents opened the furnace closet and flashed their flashlights into the furnace closet.

56. Cenlar's agents did not see B.M. and left the basement.

57. B.M. hid in the furnace closet until he can no longer hear any noises in the subject property. After B.M. believed that he was safe, he finally came out of hiding and went upstairs.

7

58.  B.M. looked outside of a window on the main level of the subject property and observed his neighbor talking to police officers right outside the front door of the subject property.

59.  B.M. could not open the front door so he told to the police officers to meet him at the back door of the subject property.[3]

60.  When B.M. got to the back door, he discovered that Cenlar's agents had forcibly broke into the subject property by breaking the back door and that Cenlar's agents had placed a lock on the back door.

61.  Shortly thereafter, Nikki arrived at the subject property and discovered the following: (1) police at her home; (2) B.M. in a state of extreme emotional distress; (3) a lock on the back door that restricted Nikki's access to her home; (4) open drawers and cabinets; (5) a broken back door with screws and door panel on the floor; and (6) a missing flat-screen television.

62.  Realizing that she could not enter the subject property, Nikki solicited the help of the police officers on site to break the lock that Cenlar's agents placed on the back door.

63.  The police tried to break the lock on the back door but were unable to. Accordingly, Nikki was forced to hire a locksmith to break the lock on the back door so she can access her home.

64.  After obtaining access to her home, Nikki filed a police report for the burglary/forcible entry that was committed by Cenlar's agents.

65.  Defendants did not leave any message or communication at the subject property notifying Plaintiffs of their identities or the reason they changed the locks, leaving Plaintiffs to wonder if they were in imminent danger of a future break-in.

---

[3] The front door to the subject property was inoperable prior to the break-in. Accordingly, the back door was the sole point of entry to the subject property.

8

66. Shortly after the break-in, Nikki called Cenlar to inquire if Cenlar had anything to do with the break-in.

67. In response to Nikki's inquiry, a Cenlar representative acknowledged that Cenlar sent representatives to the subject property in an effort to determine if the subject property was vacant.

68. Cenlar knew or should have known that the subject property was not vacant because Nikki had recently submitted a loan modification application, which indicated the property was occupied.

69. Up until the time the Cenlar representative told Nikki that it was Cenlar that sent representatives to the subject property, Plaintiffs did not know who broke into their home.

70. At all times relevant, Nikki was the legal owner of the subject property.

71. At all times relevant, the subject property served as Plaintiffs' principal residence and family home.

72. At all times relevant, the subject property was fully furnished.

73. At all times relevant, Defendants did not have authority to enter the subject property.

74. At all times relevant, Defendants did not notify Plaintiffs that it would be sending representatives to the subject property to determine if the subject property was vacant.

75. At all times relevant, Defendants did not have a legal right to enter the subject property.

76. At all times relevant, Lakeview had a consensual agency relationship with Cenlar whereby Lakeview (as the principal) had the right to control and direct the activities of Cenlar, and Cenlar had the authority to act on behalf of Lakeview. Lakeview, as the principal of Cenlar, is liable for the acts of Cenlar and Cenlar's agents.

77. At all times relevant, Cenlar had a consensual agency relationship with Five Brothers whereby Cenlar (as the principal) had the right to control and direct the activities of Five Brothers,

9

and Five Brothers had the authority to act on behalf of Cenlar. Cenlar, as the principal of Five Brothers, is liable for the acts of Five Brothers and its agents.

78.   At all times relevant, Five Brothers had a consensual agency relationship with Masterbuilt whereby Five Brothers (as the principal) had the right to control and direct the activities of Masterbuilt, and Masterbuilt had the authority to act on behalf of Five Brothers.

79.   Upon information and belief, Defendants do not have a license to change locks as required by the Illinois Locksmith Act.

### PLAINTIFFS' DAMAGES

80.   Plaintiffs have suffered significant damages that were proximately caused by Defendants' conduct.

81.   As a result of Defendants' conduct, Plaintiffs suffered extreme emotional distress, anxiety, mental anguish, and pain and suffering resulting from (a) the constant fear that their home will be broken into again; and (b) the deprivation of the sense of security and safety in their home.

82.   As a result of Defendants' conduct, Plaintiffs lost access to their home for a limited period of time.

83.   As a result of Defendants' conduct, Plaintiffs permanently lost the sense of security and safety in their home.

84.   As a result of Defendants' conduct, Plaintiffs permanently lost the enjoyment of their home.

85.   As a result of Defendants' conduct, Plaintiffs permanently lost the comfort of their home.

86.   As a result of Defendants' conduct, Plaintiffs suffered extended loss of sleep resulting from nightmares involving break-ins to their home.

87.   As a result of Defendants' conduct, Plaintiffs' back door was significantly damaged.

10

88. As a result of Defendants' conduct, Nikki suffered out of pocket expenses incurred for (1) hiring a locksmith to break the lock on the back door; (2) fixing the damage to the back doors; and (3) purchasing a new lock for the back door.

89. As a result of Defendants' conduct, Plaintiffs expended significant time and energy fixing the damaged door and replacing the lock on the back door.

90. As a result of Defendants' conduct, Plaintiffs suffered public humiliation and embarrassment arising from the police presence at their home.

91. As a result of Defendants' conduct, Nikki suffered the loss of income. Specifically, Nikki took 3 days off of work after the break-in to stay home and comfort B.M. as he was extremely traumatized by the break-in.

92. As a result of Defendants' conduct, Plaintiffs were permanently deprived of their flat-screen television.

### COUNT I – BREACH OF CONTRACT (NIKKI AGAINST LAKESHORE)

93. Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

94. The subject loan is a valid and enforceable contract between Nikki and Sun West and its successors and assigns ("the contract").

95. Lakeview is Sun West's successor and assign, and thus Lakeview is bound by the terms of the contract.

96. Pursuant to the contract, Lakeview "may inspect [the subject property] if the [subject property] is vacant or abandoned or the loan is in default."

97. The contract further states that Lakeview "may take reasonable action to protect and preserve" the subject property if it is vacant or abandoned.

11

98. Lakeview breached the contract by breaking into the subject property without Nikki's consent.

99. Although the contract permits Lakeview to "inspect" the subject property, the contract does not authorize Lakeview or its agents to forcibly break into the subject property.

100. Moreover, Lakeview breached the contract by taking unreasonable action to "protect and preserve" the subject property because the subject property was not vacant or abandoned.

101. Moreover, forcibly breaking into the subject property is not "reasonable" by any standard.

102. As pled above, Nikki was severely harmed by Lakeview's breach of the contract and thus is entitled to compensation for her damages.

103. Moreover, Nikki is entitled to punitive damages for Lakeview's breach of the contract because the break in constituted independent and willful torts (trespass, intrusion upon seclusion, and intentional infliction of emotional distress) accompanied by "wantonness" and "oppression." *See Hunter Douglas Metals, Inc. v. Edward C. Mange Trading Co.,* 586 F. Supp. 926, 929 (7th Cir. 1984) (finding that where a breach of contract contains allegations sufficient to support both a contract claim and an independent tort, both may stand and punitive damages may be awarded if plaintiff is able to sustain his burden under the tort theory.)

**WHEREFORE,** Plaintiff NIKKI PARHAM respectfully requests that this Honorable Court:

a. Find that Lakeview materially breached the contract;

b. Award Plaintiff her actual damages;

c. Award Plaintiff punitive damages; and

d. Award Plaintiff any other relief this Honorable Court deems equitable and just.

## COUNT II – TRESPASS TO REAL PROPERTY
### (NIKKI AGAINST ALL DEFENDANTS)

104.     Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

105.     At all times relevant, Nikki owned the subject property and had a legal right to exclusive possession of the subject property.

106.     Defendants had actual knowledge that Nikki owned and occupied the subject property.

107.     Without consent or a right to possession, Defendants forcibly entered and assumed dominion and control of the subject property.

108.     Without consent or a right to possession, Defendants placed a lock on the back door of the subject property, thus depriving Nikki of access to the subject property.

109.     Defendants' forced entry and trespass upon the subject property interfered with Nikki's possession, ownership, use, and enjoyment of the subject property.

110.     Upon information and belief, it is Defendants' normal business practice to ignore possessory and ownership rights of homeowners, and to illegally take possession of properties without consent or a court order, in conscious disregard of the rights of homeowners.

111.     As pled above, Nikki was severely harmed by Defendants' conduct.

**WHEREFORE**, Plaintiff NIKKI PARHAM respectfully requests that this Honorable Court:

    a.     Find that Defendants unlawfully trespassed on the subject property;

    b.     Award Plaintiff her actual damages;

    c.     Award Plaintiff punitive damages; and

    d.     Award Plaintiff any other relief this Honorable Court deems equitable and just.

**COUNT III – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS
PRACTICES ACT
(PLAINTIFFS AGAINST ALL DEFENDANTS)**

112.    Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

113.    Plaintiffs meet the ICFA definition of "consumer" and "person."

114.    Defendants violated ICFA by employing unfair and deceptive acts and practices against Plaintiffs.

115.    Defendants specialize in mortgage lending, servicing, debt collection, property preservation, and the expedited turnover of real property to satisfy defaulted mortgage debt. These actions occur in the course of conduct involving trade or commerce.

**a.  Unfairness and Deception**

116.    It was unfair for Defendants to dispossess the Plaintiffs of the subject property without a court order authorizing the same.

117.    It was unfair for Defendants to employ self-help and take possession of the subject property outside the judicial process mandated by the Illinois Mortgage Foreclosure Law ("IMFL") (defining possessory rights and the prohibition against harassment or intimidation to compel occupants to abandon mortgaged property).

118.    It was unfair for the Defendants to lock the Plaintiffs out of their home in an effort to force them to "give up" possession of the subject property.

119.    It was unfair for Defendants to change the lock of the back door of the subject property without having a valid license required by the Illinois Locksmith Act.

120.    It was unfair for Defendants to forcibly enter Plaintiffs' home without legal authorization to do the same.

14

121.    It was unfair for Defendants to cause damage to the back door of the subject property and not compensate Nikki for the damage caused by Defendants.

122.    It was unfair for Defendants to steal Plaintiffs' flat-screen television and not compensate Plaintiffs for the same.

123.    Defendants' conduct offends public policy as it demonstrates an industry-wide practice of maximizing profits by ignoring the possessory rights of homeowners in violation of the law, expediting the foreclosure process by circumventing the law, and attempting to profit from the expedited sale of real property.

124.    It was unfair and deceptive for Lakeview to mislead Nikki into believing that Lakeview may modify the subject loan when Lakeview had no intent to modify or even consider a modification of the subject loan.

125.    Plaintiffs had no choice but to submit to Defendants' conduct. Specifically, Plaintiffs had no control over (1) the sham loan modification process; (2) the changing of the lock; (3) the destruction to the subject property; and (4) their ability to enter their home after Defendants illegally changed the locks.

126.    It was unfair and deceptive for Defendants to erroneously deem the subject property "vacant" or "abandoned" when Defendants had actual knowledge that the subject property was occupied as the loan modification applications submitted by Nikki expressly stated that the subject property was occupied.

127.    It was unfair and deceptive for Defendants to erroneously deem the property "vacant" or "abandoned" despite the fact that the subject property was conspicuously occupied and well-maintained.

128.     Defendants intended that the Plaintiffs would rely on their unfair and deceptive acts; their overall scheme was designed to thwart Nikki's attempt to keep her home and designed to buffalo Nikki into giving up her home without having to complete the foreclosure process.

129.     Nikki did rely on upon Defendants' unfair and deceptive acts by completing the loan modification application that Lakeview and/or Cenlar had no intention of granting.

130.     Defendants were hoping that their illegal conduct would ultimately drive the Plaintiffs out of their home so Defendants could take possession without having to complete the lengthy foreclosure process. Defendants' objective was to profit from an expedited sale of the subject property.

131.     Defendants' overall conduct towards Plaintiffs was oppressive and against public policy.

132.     As pled above, Plaintiffs were severely harmed by Defendants' conduct.

133.     Defendants' conduct causes substantial injury to consumers generally because:

   i.  consumers reasonably expect to be safe and secure in their own property;

   ii.  consumers reasonably expect mortgage companies to communicate with them truthfully and accurately regarding the occupancy status of a home or any claims of vacancy or abandonment;

   iii.  consumers reasonably expect mortgage companies to evaluate their loan modification applications in good faith;

   iv.  consumers reasonably expect companies to follow state and federal law and their own guidelines;

   v.  consumers reasonably expect that companies will not take illegal action to expedite a foreclosure and bully consumers from their property;

   vi.  consumers reasonably expect companies to make honest efforts to resolve a dispute, instead of misrepresenting facts and ignoring requests and inquiries; and

16

vii. consumers reasonably expect mortgage companies to honor and respect laws designed to protect consumers.

viii. consumers reasonably expect property preservation companies to not forcibly break into their homes, change the locks, and steal their personal property.

134.    An award of punitive damages is appropriate because Defendants' conduct was outrageous, willful, wanton, showed a reckless disregard for the rights of the Plaintiffs, and was designed to take advantage of a vulnerable family.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

a.    Enter judgment in Plaintiffs' favor and against Defendants;

b.    Award Plaintiffs their actual damages;

c.    Award Plaintiffs punitive damages;

d.    Award Plaintiffs their reasonably attorney's fees and costs; and

d.    Award Plaintiffs any other relief this Honorable Court deems equitable and just.

### COUNT IV – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (PLAINTIFFS AGAINST ALL DEFENDANTS)

135.    Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

136.    The subject loan is a "debt" as defined by the FDCPA §1692a(5) because the mortgage loan was incurred to finance the purchase of Nikki's principal residence, and thus incurred for personal, family, or household purposes.

137.    Defendants are a "debt collector" as defined by the FDCPA §1692a(6) because they use instrumentalities of interstate commerce or the mails to collect debts and enforce security interests.

138.    Defendants are a "debt collector" as defined by the FDCPA §1692a(6) because their principal business purpose is the collection of debts.

139.    Defendants are a "debt collector" as defined by the FDCPA §1692a(6) because they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

140.    Defendants are a "debt collector" as defined by the FDCPA §1692a(6) because they are in the business of enforcing security interests.

141.    Defendants Lakeview and Cenlar are a "debt collector" as defined by the FDCPA §1692a(6) because they acquired rights to the subject loan after it was in default.

142.    At all times relevant, Defendants were attempting to collect a debt owed by Nikki to Lakeview.

**a.  Violations of §§1692f(1) and f(6)(A)**

143.    In an effort to collect the subject loan, Defendants violated §§1692f(1) and(6)(A) by taking illegal non-judicial action and employing self-help to dispossess the Plaintiffs of the subject property. As stated above, Defendants had no legal or contractual right to forcibly enter the subject property, change the lock, and take possession of the subject property because (1) the foreclosure proceeding was still pending and Defendants did not have a court order authorizing them to take possession of the subject property and (2) it was unnecessary to "preserve" the subject property because the subject property was not "vacant" or "abandoned" and conspicuously in good condition.

144.    Defendants evicted and dispossessed Plaintiffs from their home without a valid basis and in violation of state law.

145.    As stated above, Defendants' conduct violated the IMFL and the Illinois Locksmith Act.

**b.  Violations of §§1692e, e(2), and e(10)**

146.    In an effort to collect the subject loan, Defendants violated §1692e by falsely representing, through implication, that Nikki was no longer the owner of the subject property and that Plaintiffs were no longer authorized to access the subject property. Specifically, the changing of the lock implicitly implies that Nikki is no longer the owner of the subject property and has lost access to the subject property.

147.    In an effort to collect the subject loan, Defendants violated §1692e(2) by misrepresenting the legal status of the subject loan. Specifically, by changing the lock, the Defendants falsely represented, though implication, that the foreclosure process has been completed and that subject property no longer belongs to Nikki.

148.    In an effort to collect the subject loan, Defendants violated §1692e(10) by falsely and deceptively representing, through implication, that the foreclosure process has been completed and that the subject property no longer belongs to Nikki

149.    As pled above, Plaintiffs were severely harmed by Defendants' conduct.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

    a.       Enter judgment in Plaintiffs' favor and against Defendants;

    b.       Award Plaintiffs their actual damages;

    c.       Award Plaintiffs statutory damages;

    d.       Award Plaintiffs reasonable attorney's fees and costs under 15 U.S.C. §1692k; and

    d.       Award Plaintiffs any other relief this Honorable Court deems equitable and just.

### COUNT V – INTRUSION UPON SECLUSION
### (PLAINTIFFS AGAINST ALL DEFENDANTS)

150.    Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

19

151.    To establish a claim for intrusion upon seclusion, Plaintiffs must establish (1) there was an unauthorized intrusion into seclusion; (2) the intrusion would be highly offensive to a reasonable person; (3) the matter intruded upon was private; and (4) the intrusion caused anguish and suffering. *Maremont v. Susan Fredman Design Group, Ltd.,* 2011 U.S. Dist. LEXIS 140446, at *20 (N.D. Ill. 2011).

152.    Defendants intruded into Plaintiffs' seclusion by forcibly entering Plaintiffs' home without authorization and changing the lock.

153.    Defendants' conduct was highly offensive and objectionable to a reasonable person.

154.    As pled above, Plaintiffs suffered significant mental anguish and suffering as a result of Defendants' conduct.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

a.      Enter judgment in Plaintiffs' favor and against Defendants;

b.      Award Plaintiffs their actual damages;

c.      Award Plaintiffs punitive damages; and

d.      Award Plaintiffs any other relief this Honorable Court deems equitable and just.

### COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (PLAINTIFFS AGAINST ALL DEFENDANTS)

155.    Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

156.    To state a claim for intentional infliction of emotional distress, plaintiffs must establish that (1) the defendants' conduct was extreme and outrageous; (2) the defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) the defendants' conduct actually caused severe emotional distress. *Honaker v. Smith,* 256 F.3d 477, 490 (7th Cir. 2001).

157.    Defendants' are liable for intentional infliction of emotional distress because (1) forcibly entering Plaintiffs' home and changing the lock without authorization was extreme and outrageous; (2) Defendants knew that forcibly entering Plaintiffs' home and changing the lock would inflict severe emotional distress on Plaintiffs; and (3) Defendants' conduct actually caused Plaintiffs severe emotional distress.

158.    At very minimum, Defendants are liable for negligent infliction of emotional distress.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

    a.    Enter judgment in Plaintiffs' favor and against Five Brothers and Masterbuilt;

    b.    Award Plaintiffs their actual damages;

    c.    Award Plaintiffs punitive damages; and

    d.    Award Plaintiffs any other relief this Honorable Court deems equitable and just.

### COUNT VII - CONVERSION
### (AGAINST FIVE BROTHERS AND MASTERBUILT)

159.    All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

160.    Conversion is "the unauthorized deprivation of property from the person entitled to its possession." *Law v. Yanni* (*In re Estate of Yanni*), 400 Ill. Dec. 721, 48 N.E.3d 1161, 1166, 2015 IL App (2d) 150108 (Ill. App. Ct. 2015).

161.    Conversion's essence is "the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Id.*

162.    A cause of action for conversion requires "(1) the unauthorized and wrongful assumption of control, dominion, or ownership by the defendant over the personal property of

another; (2) the plaintiff's right in the property; (3) the plaintiff's absolute and unconditional right to immediate possession of the property; and (4) a demand for possession of the property." *Id.*

163.    Cenlar's agents, without authority or consent, assumed control, dominion, or ownership over Nikki's personal property, namely her flat-screen television.

164.    Nikki has an immediate, absolute, and unconditional right to possession to her personal property.

165.    Cenlar's agents destroyed or remained in unlawful possession of Nikki's personal property.

166.    Nikki demanded the return of her personal property from Cenlar's agents, or a demand of her personal property would be futile because Cenlar's agents sold or otherwise disposed of Nikki personal property.

167.    Cenlar's agents have made no attempt to replace or return Nikki's personal property or offer to pay the equivalent monetary value.

168.    Cenlar's agents' actions proximately caused the loss of Nikki's personal property.

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court:

a.      Enter judgment in their favor and against Five Brothers and Masterbuilt;

b.      Award Plaintiffs their actual damages;

c.      Award Plaintiffs punitive damages; and

d.      Award such other relief as this Court deems just and proper.

### COUNT VIII - NEGLIGENCE
### (AGAINST FIVE BROTHERS AND MASTERBUILT)

169.    Plaintiffs restate Paragraphs 1 through 92 as fully stated herein.

170. Cenlar's agents voluntarily exercised control and dominion over the subject property and Plaintiffs' personal property. Once a party voluntarily undertakes to perform a service, it must do so in a manner that does not increase the risk of harm to the person affected by the undertaking.

171. Cenlar's agents took affirmative steps to control access to and possession of the subject property by changing the locks, restricting access for a period of time, and exercising dominion and control over the personal property therein.

172. Cenlar's agents breached their duty to take reasonable steps to protect the subject property, comply with the law, or follow the practices and procedures within their own manuals and work order guidelines.

173. Cenlar's agents breached their duty by (a) failing to protect or secure the subject property; (b) violating the law; (c) failing to allow their own formalized procedures, and (d) failing to use reasonable care when "securing" the subject property.

174. Cenlar's agents breached their duty to act prudently by contributing to and enabling the destruction of the subject property and Plaintiffs' personal property and by failing to prevent any loss or destruction after voluntarily exercising control and dominion over the subject property.

175. It was reasonably foreseeable that unilaterally taking control and failing to take basic step to protect the subject property violated the law and Cenlar's agents' own procedures.

176. It was reasonably foreseeable that taking dominion and control of the subject property and actively restricting Plaintiffs' access to the subject property would damage Plaintiffs.

177. Cenlar's agents were aware that their actions would likely result in injury to Plaintiffs, but willfully ignored their duty of reasonable care. Cenlar's agents acted with such gross and willful negligence as to indicate willful and wanton disregard of Plaintiffs' rights.

178.    Cenlar's agents' actions proximately caused damages to the subject property and

Plaintiffs.

179.    As pled above, Plaintiffs were severely harmed by Cenlar's agents' conduct.

**Plaintiffs demand a trial by jury.**

Dated: March 5, 2020                                    Respectfully Submitted,

                                                       /s/ Mohammed O. Badwan

                                                       Mohammed O. Badwan, Esq.
                                                       Joseph S. Davidson, Esq.
                                                       *Counsel for Plaintiffs*
                                                       Sulaiman Law Group, Ltd.
                                                       2500 S. Highland Ave., Ste. 200
                                                       Lombard, IL 60148
                                                       Phone (630) 575-8180
                                                       Fax (630) 575-8188
                                                       mbadwan@sulaimanlaw.com
                                                       jdavidson@sulaimanlaw.com

24

EXHIBIT 2

## EXHIBIT "A"

## STATEMENT OF WORK
### (Cenlar Mortgage)

This Statement of Work ("SOW") is made and entered into effective the 1st day of January, 2014 ("Effective Date"), by and between Cenlar FSB ("Customer") and Five Brothers Mortgage Company Services and Securing, Inc. ("Five Brothers").

All terms and conditions of the Contract shall apply to this SOW, including but not limited to confidentiality, privacy, indemnification and termination provisions, and such terms and conditions are fully incorporated herein by reference. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Contract. If a term in this SOW conflicts with a term in the Contract, the provisions of this SOW shall prevail. Reference in this SOW to sections will refer to the sections of this SOW unless otherwise instructed.

The term of this SOW shall be for a period of two (2) years, commencing on the Effective Date, and shall be automatically renewed for successive one (1) year terms unless otherwise terminated by any Party as provided in section 7 of the Contract.

## DESCRIPTION OF SERVICES

Five Brothers agrees to provide Cenlar with the following deliverables and/or services, in accordance with industry standards, upon written or electronic request of Cenlar:

### 1) Property Preservation (including but not limited to Securing, Maintenance, and Repairs)

Five Brothers shall provide property preservation ("Property Preservation") services for Cenlar's servicing/subservicing portfolio of loans and real estate owned properties and Five Brothers shall confirm timely and successful completion of all approved Property Preservation work. Five Brothers will be responsible for all third party contractor expenses related to the performance of Property Preservation for which a work order or other approval to perform has been issued.

When Customer specifies an investor/insurer for a property, the investor/insurer guidelines in effect at the time will be followed, unless modified by Customer-specified requirements. For FHA properties, as well as properties for which the Customer does not specify an investor/insurer, Five Brothers shall follow FHA property preservation guidelines as described in the Department of Housing and Urban Development (HUD) Mortgagee Letters (as they may be modified from time to time), unless otherwise directed by the Customer. For all other investor/insurers, conventional or real estate owned loans, the following general guidelines apply:

**Securing** – Once an initial securing order has been issued by Customer, Five Brothers will confirm vacancy, inspect the property and complete the following upon Customer instruction, unless prohibited by municipal/county/state ordinance/regulations:

- Change locks - utilizing one master key or as required by applicable regulations
- Install lockbox with key code
- Install padlock, hasp or similar lock

{4105/00026809.DOCX. 2/27/2014}

**Exhibit 2**

- Install slide bolts or similar lock
- Board, or re-glaze, any broken windows and/or doors
- Secure and winterize swimming pools, hot tubs and spas

**Debris Removal** – All debris removal shall be in accordance with investor/insurer guidelines, municipal ordinances and/or Customer instruction.

**Winterization** – Five Brothers will winterize vacant properties in accordance with investor/insurer guidelines or as instructed by Customer. Unless the applicable guidelines or Customer instructions indicate otherwise, winterization includes:

- Draining all plumbing and heating systems (including spas)
- Using air pressure to clear the system of water
- Adding anti-freeze to all traps and fixtures
- Shutting off water supply to the property
- Disconnecting and plugging or capping feed pipe leading to the main water valve
- Placing tags, labels, and/or warning signs, showing service date(s) and Five Brothers' address and telephone number, on all items winterized
- Water services and utilities will be maintained for all properties sharing water services and utilities, such as condominiums

Winterization procedures may vary depending on property specifics (e.g. dry or wet systems and sump pumps, and applicable investor/insurer guidelines). If circumstances make full winterization impossible, a partial winterization will be performed unless otherwise directed by Customer. A winterization is not a certification of the plumbing system nor a guarantee that no freeze damage has occurred or will occur to the property. Five Brothers will advise the Customer of any freeze damage observed at time of winterization.

**Winterization Re-check** – Five Brothers will perform re-checks in accordance with investor/insurer guidelines unless otherwise directed by Customer. Five Brothers will inspect a previously performed winterization to determine whether it is still effective. Where additional winterization is necessary, bids must be submitted and the property will be winterized again.

**Lawn Maintenance** – Five Brothers will maintain property grounds by mowing, edging, grass clippings removal, shrubbery and performing other lawn maintenance as needed. All lawn maintenance is performed in accordance with applicable investor/insurer guidelines or Customer instruction. When performing lawn maintenance, Five Brothers will verify that the property is secured in accordance with applicable regulations and/or Customer instructions.

**Snow Removal** – Upon Customer request or when required by local ordinance, snow and ice will be removed according to investor/insurer specifications. Snow-melting compounds will be applied to ensure that cleared areas remain ice-free.

**Conveyance Maintenance** – Upon request, Five Brothers will prepare a property for conveyance pursuant to the current investor/insurers guidelines specifying the preservation and protection responsibilities of the servicer. If new unreported damages have occurred to the property, Five Brothers will immediately notify the Customer and provide necessary documentation to request a time extension for conveyance if necessary.

**Roof Repairs** – Five Brothers shall provide roof repairs in accordance with investor/insurer specifications and guidelines or Customer instructions.

**Mold Removal** – Five Brothers shall provide mold removal/remediation in accordance with investor/insurer guidelines or as instructed by Customer.

**Rush Services** – Preservation services can be ordered on a rush basis, at rates to be determined by bid.

*Property Preservation Services Minimum Service Level Standards:*
The following servicing level standards shall apply for all Property Preservation services, unless otherwise stated herein:

- Standard preservation services completion time frame is 7-10 calendar days
- In the winter months, Five Brothers will complete winterization services within 24–48 hours. In the non-winter months, other than Fannie Mae winterization services, are to be completed within 7-10 calendar days of the property being reported as vacant, winterization season starting, or from the date the winterization order is received by Five Brothers, whichever occurs later.
- Winterization services for Fannie Mae are to be completed within 7 calendar days of the property being reported as vacant, winterization season starting, or from the date the winterization order is received by Five Brothers, whichever occurs later
- Conveyance bids shall be completed within 5 calendar days
- Conveyance maintenance services shall be completed within 10 calendar days

Five Brothers will use good faith efforts to complete all preservation services within the 7 to 10 calendar day time frame; however, we cannot guarantee that every preservation service will be completed within that time frame. Completion time frames are affected by several variables, including property location, road conditions and access, and weather, which may cause delays in more rural areas. The parties realize that there may be deviations from the above listed service levels when unanticipated problems arise or the situation and circumstances warrant it.

## 2) Inspections

*Property Inspections:*

**Occupancy: Bankruptcy** – Visual exterior, no contact/drive-by only, inspection for occupancy verification per investor/insurer guidelines and/or Customer instruction with property description. (No property or dwelling access shall be attempted and no contact made with the mortgagor, occupant or other third parties.)

**Occupancy: Collection "Door Knock"** – Exterior inspection for occupancy verification per investor/insurer guidelines and/or Customer instruction with property description. One attempt is made to contact the mortgagor or occupant or other third party. (No dwelling access shall be attempted.) A door hanger card (with Customer-specific information and phone) will be left at the home or given to the mortgagor, occupant or other third party.

**Occupancy: Foreclosure** – Exterior inspection for occupancy verification per investor/insurer guidelines and/or Customer instruction with property description. One attempt is made to contact the mortgagor or occupant or other third party. (No dwelling access shall be attempted.) A door hanger card (with

Customer-specific information and phone) will be left at the home or given to the mortgagor, occupant or other third party.

**Occupancy: FNMA Form 30 Property Inspection** – Visual exterior inspection of residential properties in accordance with current requirements of the Federal National Mortgage Association (FNMA). One attempt is made to contact the mortgagor or occupant or other third party. (No dwelling access shall be attempted.) A door hanger card (with Customer-specific information and phone) will be left at the home or given to the mortgagor, occupant or other third party.

**Interior** – Dwelling "walk-through" inspection in compliance with investor/insurer guidelines and/or Customer instruction. The primary purpose of this inspection is to identify visible damages, mold or other obvious problems that need to be addressed immediately. Does not include comprehensive testing or certification of property condition.

**Manufactured/Mobile Home**

*Occupancy* – Exterior inspection for occupancy verification per investor/insurer guidelines and/or Customer instruction with property description. One attempt is made to contact the, owner/mortgagor, occupant and/or other third party. (No dwelling access shall be attempted.) A door hanger card (with Customer-specific information and phone) will be left at the home or given to the mortgagor, occupant or other third party.

*Interior* – Dwelling "walk-through" inspection in compliance with investor/insurer guidelines and/or Customer instruction with property description. The primary purpose of the interior inspection is to identify visible damages, mold, or other obvious problems that need to be addressed immediately. Does not include comprehensive testing or certification of property condition. An attempt to identify VIN number will be performed as requested by Customer.

*Affidavit of Affixture* – Exterior inspection to determine if manufactured/mobile home is affixed to foundation. Interior inspection in an attempt to collect data sheet information and VIN number. An attempt to complete required "Affidavit of Licensed Professional in Support of Affidavit of Affixture Filing" for Customer filing.

**Sale Date/Redemption Date** – Contact inspection for occupancy performed on the foreclosure sale date or redemption date as specified by Customer. One attempt is made to contact the mortgagor or occupant or other third party. (No dwelling access shall be attempted.)

**Eviction** – Exterior inspection for occupancy performed before the eviction date as specified by Customer. (No dwelling access shall be attempted.) Notice of eviction posted at subject property per Customer instructions with photo documentation provided.

***Specialty Inspections:***

**REO Exterior** – Exterior inspection for occupancy, lockbox, for-sale sign and additional verification items per investor/insurer guidelines and/or Customer instruction.

**REO Exterior/Interior** – Exterior inspection for occupancy, lockbox, for-sale sign and additional verification items per investor/insurer guidelines and/or Customer instruction. If requested, property interior can be checked for safe sanitary conditions, damage, debris/hazards, and utilities, but only if the property is vacant.

**Storm Damage Verification** – Exterior inspection to identify structural damages to the property caused by earthquake, hurricane, flood or other causes per Customer instruction with property description. (No dwelling access shall be attempted.)

**Reverse Mortgage** – Exterior inspection for occupancy verification per Customer instructions. One attempt is made to contact the occupant to determine and/or confirm that occupant is mortgagor. (No dwelling access shall be attempted.)

**Insurance** – Loss draft and casualty loss inspections to determine the percentage work completed based on Customer-provided scope of work/insurance specifications to ensure that funds are not released until work has been completed.

**FEMA Presidential-Declared Disaster** – Exterior inspection to determine whether property has sustained visible damage as a result of a Presidential-declared disaster.

**Rush Services** – Inspections can be ordered on a 24-hour and 48-hour rush basis.

***Property Inspections Services Minimum Service Level Standards:***
The following servicing level standards shall apply for all Property Inspection services, unless otherwise stated:
- Standard inspections shall be completed within 7 to 10 calendar days. Inspection results shall be provided within three (3) business days of completion.
- Rush inspection results shall be provided within one (1) business day of completion.
- FHA inspections shall be completed within the required 25-35 day window from the previous inspection.
- Fannie Mae, Freddie Mac and VA inspections shall be completed every 30 days.

Five Brothers will use good faith efforts to complete all inspections within the 7 to 10 calendar day time frame; however, we cannot guarantee that every inspection will be completed within that time frame. Completion time frames are affected by several variables, including property location, road conditions and access, and weather, which may cause delays in more rural areas. The parties realize that there may be deviations from the above listed service levels when unanticipated problems arise or the situation and circumstances warrant it.


## 3) Vacant Property Registration

Five Brothers will perform vacant property registration for properties included on list of first time vacancies, provided by Cenlar. Five Brothers is not acting as a property manager.

Five Brothers will assure vacant property code compliance through a comprehensive seven-step process:
1. Monitor database daily to track codes requiring registration of vacant, distressed or foreclosed properties
2. Identify properties subject to registration amongst the list of first time vacancies provided by Cenlar
3. Verify that property is within jurisdiction boundaries, contacting appropriate authorities, as needed
4. Register the property using the municipality's web-enabled or paper-based system
5. Pay required fees to insure prompt registration, billing Customer upon completion
6. Notify Customer of completed registration
7. Follow through on related requirements, such as posting of signs at property, compliance with industry regulatory guidelines, etc.


## 4) Hazard Claims Management

Five Brothers will provide Cenlar with efficient and cost-effective hazard claims management services.

Five Brothers will automatically initiate a Hazard Insurance claim if the bid amount is greater than $2,500 and the damage is typically coverable. Five Brothers will track recoveries and denied claims for Cenlar. Denied claims will be pursued and factual documentation to dispute such claims prepared and submitted to the carrier for timely objections.

Five Brothers will provide Cenlar with claim summary and claim check. Cenlar will advise Five Brothers whether or not to proceed with any work,

Five Brothers will oversee contractor work as well as coordinate building inspectors, attorneys and other professionals representing various contingent interests.
Five Brothers will provide progress photos as a visual record of all work performed. Five Brothers will review final repairs to ensure compliance with insurance scope of work and relevant regulatory guidelines. Only when all work is successfully completed will the job be invoiced and recoverable depreciation, if applicable, requested from the insurance company.
Five Brothers will not assess a hazard claims processing fee if Five Brothers is allowed to complete the repairs. If Five Brothers is not assigned the repairs, then a processing fee (see pricing section) may be assessed to Customer.

## 5) Municipal Code Compliance

Five Brothers shall update Cenlar on current code compliance issues and potential violations so they can be addressed early in the property preservation cycle. Should a violation occur, Five Brothers will provide itemized estimates of work needed to bring the property into full compliance with local codes.

## 6) Document Delivery Services – Sealed Envelope Delivery

Five Brothers will prepare, deliver and track delivery of sealed envelope documents to homeowner.
Five Brothers document delivery services include:

- Customer-specific document templates generated and delivered to homeowners
- All documents are delivered in a sealed envelope
- All documents must have a name printed/typed on envelope and must be clearly marked "to be opened by addressee ONLY"
- Sealed envelope will be sent to field representative (acting as courier) via regular mail
- Field representative will deliver sealed envelope to address, securely affix sealed envelope to the entry door (photo required) or leave with person answering the door (sealed envelope will not be left with a child, neighbor or placed in the mailbox for any reason)
- Delivery results are documented and reported

Five Brothers will neither request nor accept cash, checks, money orders, or any other form of payment or consideration from any person, occupant or mortgagor. It is Five Brothers' policy that it will not discuss or allude to the mortgagor's loan or delinquency or default with the occupant, the mortgagor, or any third party. Five Brothers will only act as a delivery courier and will not be required to, nor will it perform any debt collection services under the Agreement, this Statement of Work, or any amendment thereto.

## 7) Bid Validation Service

Using the latest HUD-approved cost estimator, Five Brothers will identify and resolve Cenlar's non-conforming repair/maintenance bids, streamlining bid validation and submittal to HUD.

## 8) Bid Data Entry

Five Brothers' bid data entry service will provide efficient entry of Cenlar property preservation bid data, including photo transfers, for FHA/HUD, Fannie Mae, Freddie Mac loans into the HUD P260 portal, Fannie Mae's HomeTracker and Freddie Mac's reimbursement system. Five Brothers will then submit and monitor the bids for FHA/HUD, Fannie Mae, Freddie Mac loans.

Five Brothers will enter Cenlar property preservation bid data for all other loans into its FiveOnline workflow management portal. Five Brothers will then post notification of completed data input to Cenlar's web-based FiveOnline® asset preservation workflow management account, which is Customer accessible 24/7. Cenlar will access the information and electronically accept and submit the pre-entered bid.

## 11) Utility Management Solution

Upon request, Five Brothers will effectively manage Cenlar's utility expenses associated with default and real estate owned properties – including electric, gas, water, sewer and propone. Five Brothers will provide timely and efficient utility transfer, invoice processing and payment, seamless transfer to new owners, as well as comprehensive reporting.

### *FiveOnline® – Workflow Management System*

With convenient and secure 24/7 online access, FiveOnline will provide Cenlar with real-time ordering, tracking and management of asset preservation and real estate owned services.

FiveOnline will provide on-demand retrieval of documents, photos, work orders, bids, etc., and instantly generate work status updates and property condition reports. Easy-to-generate management reports will capture and track performance, events, costs and user activity over time.

> *Training* – Five Brothers will provide authorized system users with both web-based and on-site training through its FiveOnline workflow management portal. Training modules, including downloadable training materials, demonstrate how to order work, track status and obtain and read management reports. Custom training programs are also available, based on Customer need.

## Cenlar Field Services Business Rules

Five Brothers agrees to perform the additional services and in the manner detailed in the Cenlar Field Services Business Rules, attached hereto as Exhibit C, as said document may be amended from time to time by mutual agreement.

## INVOICING

Pricing for all the services contained in this SOW shall be agreed to by the Parties and are attached hereto as Exhibit B. Invoices shall be submitted and payment remitted to Five Brothers in accordance with the Master Service Agreement and the attached Exhibit B, which is incorporated herein in its entirety by reference.

{4105/00026899.DOCX. 2/27/2014}

**PRIMARY CONTACT INFORMATION**

**CENLAR**

Contact: Michael Blair

Phone: 609-883-3900

Email: mblair@cenlar.com

Address: 425 Phillips Boulevard, Ewing, NJ 08618

**FIVE BROTHERS**

Contact: Kevin Cooke

Phone: (586) 772-7600

Email: kevinc@fiveonline.com

Address: 12220 E. 13 Mile Road, Warren, MI 48093

By the signatures of their duly authorized representative below, Five Brothers and Cenlar, intending to be legally bound, agree to all of the provisions of this Statement of Work as of the Statement of Work Effective Date set forth above.

**CENLAR MORTGAGE**

By: _____

Name: Michael Blair

Title: Senior Vice President

Date: _____ 4-16-14 _____

**FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC.**

By: _____

Name: Joseph Badalamenti

Title: President/CEO

Date: _____ 4.11.14 _____

EXHIBIT 3

## Third Amendment to Master Service Agreement

**THIS AMENDMENT** ("Amendment") to the Field Services Agreement is dated and effective as of March 31, 2017, between **Cenlar FSB**, a federally chartered savings bank **("Cenlar")**, and **Five Brothers Mortgage Company Services and Securing, Inc.**, with its principal offices at 12220 East Thirteen Mile Road, Warren, MI 48093 ("Five Brothers").

**WHEREAS**, Five Brothers and Cenlar entered into a Field Services Agreement dated April 1, 2014 (the "Agreement") and a Statement of Work (Exhibit A to the Agreement) dated January 1, 2014 with an Effective Date of January 1, 2014 (the "SOW"), related to Five Brothers providing certain services to Cenlar;

**WHEREAS**, the Agreement had a termination date of January 1, 2016, and the SOW had a termination date of January 1, 2014, subject to automatic renewals for one year terms, and both the Agreement and the SOW were extended to January 1, 2017 by an Amendment dated September 16, 2016, and again extended to April 1, 2017 by a Second Amendment dated December 30, 2016; and,

**WHEREAS**, Five Brothers is continuing to provide services to Cenlar under the terms of the Agreement and the SOW and Five Brothers and Cenlar wish to extend the Agreement and SOW a second time;

**THEREFORE**, in consideration of the mutual promises and agreements contained herein and other good and valuable consideration, Five Brothers and Cenlar agree to amend the terms of the Agreement as follows:

> Five Brothers and Cenlar hereby agree that Five Brothers will continue to provide services to Cenlar pursuant to the terms of the Agreement and the SOW and establish August 1, 2017 as the termination date for the Agreement and the SOW, unless otherwise extended and agreed to in writing by both parties.

This Amendment shall supersede and prevail over any conflicting provisions of the Agreement and the SOW. All other terms of the Agreement and the SOW shall remain the same and continue in full force and effect.

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be executed on their behalf by their duly authorized offices, effective as set forth above.

| CENLAR FSB | FIVE BROTHERS MORTGAGE COMPANY SERVICES AND SECURING, INC. |
| --- | --- |
| _MICHAEL BLAIR EVP_ | _JOSEPH A BADALAMENTI, CEO_ |
| Print Name & Title | Print Name & Title |
| _3/31/2017_ | _3.31.17_ |
| Date | Date |

(3952/06050069.DOCX.3  3/30/2017)

**Exhibit 3**